**United States District Court**

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO BAY AREA RAPID
TRANSIT DISTRICT,

Plaintiff,

v.

WILLIAM D. SPENCER, et al.,

Defendants.
_____/

No. C 04-04632 SI

**ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

On November 17, 2006, the Court heard oral argument on defendants' motion for summary judgment. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby GRANTS in part and DENIES in part defendants' motion.[1] Only plaintiff's second claim, for violation of the California False Claims Act, survives, and it does so only with respect to two of the four contracts at issue.

**BACKGROUND**

Plaintiff, San Francisco Bay Area Rapid Transit District ("BART"), seeks to recover from William D. Spencer ("Spencer"), his companies, and their employees, for damages it claims were caused by the defendants' fraudulent practices in connection with work performed under BART construction subcontracts. BART alleges that the defendants charged it for thousands of dollars in fees that were used to pay "kickbacks" to another construction firm, San Luis Gonzaga Construction Company ("SLG"),

---

[1]Five days after the hearing, on November 22, 2006, the Court received a letter from plaintiff BART requesting supplemental briefing to address "some potentially important refinements to the arguments made on the issues." The Court hereby DENIES plaintiff's request. (Docket No. 211)

in exchange for use of SLG to create a minority-subcontractor front. This front allegedly allowed defendants to secure subcontracts as a favored disadvantaged business enterprise ("DBE").

**1.      The DBE program and its requirements**

Owners of local public works projects seeking federal funding must adopt specific programs to ensure participation by DBEs in their projects. *See* 49 C.F.R. § 26.21 (2006). Failure to achieve promised levels of DBE participation in such projects can result in economic sanctions and loss of future federal funding. *See id.* § 26.101.(a); 45 Fed. Reg. 21172 (Mar. 21, 1980).

Beginning in 1997, BART solicited bids for several projects, including the four at issue here – 03QG-110 ("110"), 12YC-120 ("120"), 12YS-130 ("130"), and 12YS-140 ("140") – to extend BART's commuter rail lines south to the San Francisco International Airport. All four of the projects utilized federal funds, and BART was therefore required to ensure DBE participation. In response, BART created a program under which each prime bidder was required to make a good faith commitment that DBE subcontractors would complete a certain percentage of the project. Furthermore, in order to ensure that DBEs were not simply subcontracted to do the most menial work, BART required that the DBE participation be spread across five categories. The Contract Book for the 12YC-120 contract stated, for example:

> The [DBE] participation goal for the Contract is <u>23%</u> of the Total Contract Bid Price, excluding Allowances, and is distributed by Category of Work goals as follows:

| Category | Description | Percent of Total Bid for Category of Work excluding Allowances |
|---|---|---|
| I | Professional Services | 40 |
| II | Facilities Construction | 25 |
| III | Trackwork and Systems Procurement | 5 |
| IV | Trackwork and Systems Installation | 15 |
| V | Trucking | 50 |

Balmat Decl., Ex. 1 at BART012321. Each bidder was required to fill out several forms related to DBE participation. First, in a form entitled "Designation of Subcontractors and DBEs," the bidders listed "the

name and address of each Subcontractor to whom Bidder proposes to subcontract more than 1/2 of 1% of the Work, and description and the portions of the work or services subcontracted." *Id.* at BART012597-98. The form also contained a check-box by which the bidders indicated if the subcontractor listed was a DBE. *See id.* Another form, with the same title, followed, in which the bidders listed the names and addresses of all the DBE subcontractors who would fulfill the "Professional Services" DBE requirement. *See id.* at BART012599-601. Bidders were not required to list the subcontractors who would fulfill the other four categories of DBE participation.

The contracts were awarded to the lowest bidder who could demonstrate a certain commitment to meeting the DBE requirements. As the Contract Books stated:

> **Awards.** Any award of this Contract by the District shall be to the lowest responsible Bidder whose proposal complies with all the [DBE] requirements prescribed and who has met the Professional Services goal and has committed to meeting the goals for Material Procurements, Facilities Construction, Trackwork and Systems, Trackwork and System Installation, and Trucking, or has demonstrated, to the satisfaction of the District, good faith efforts to do so. Meeting the goal and commitments, or demonstrating to the satisfaction of the District, good faith efforts to do so is a condition for being eligible for Award.

*Id.* at BART012455. The Contract Books list a series of actions that the bidders could take to demonstrate "good faith efforts" to meet the DBE requirements, including attending pre-bid informational meetings, advertising, and sending out requests for bids to DBE firms. *See id.* at BART 012450-54.

Once the contracts were awarded, the contractors were required to submit monthly updates on DBE participation levels. *See id.* at BART012455-56. If the updates indicated to BART that a contractor was not meeting the promised DBE levels, BART was required to notify the contractor of potential remedial action. *See id.* If noncompliance with the DBE program was definitively established, the Contract Books mandated the following:

> [F]ailure to maintain the level of DBE participation offered in the Bid in accordance with DBE provisions, shall be grounds at the discretion of the District, for termination of the Contract in whole or in part, for withholding payments due Contractor during the period of noncompliance, or increasing the amount of retention in accordance with Article SC9.6. In addition, failure to meet any of the goals shall be grounds for assessment of liquidated damages in accordance with Article SC8.3.1.

*Id.* at BART012458.

The Contract Books also provided procedures for substituting DBE subcontractors listed in the

bid:

> Should substitution of any DBE listed on the Designation of Subcontractors and DBE's Form become necessary, either with Bid or added in the Contract period as descried in Article SC7.1.3.6., Contractor and Subcontractors which have Subcontracts with DBEs shall, subject to the approval of the District, replace the affected DBE with another DBE or show that good faith efforts were made to do so.

*Id.* at BART012457.

As defined by the Contract Books, a DBE was "a small business concern which was at least 51 percent owned by one or more socially and economically disadvantaged individuals." *Id.* at BART012444. In the case of a joint venture between a DBE and a non-DBE, the joint venture was considered a DBE if the DBE venture partner was:

> responsible for a clearly defined portion of the Work to be performed[;] . . . satisf[ied] requirements for ownership and control[;] submitted information for determining joint venture eligibility[; and] perform[ed] a commercially useful function, i.e., must be responsible for the execution of a distinct element of work and must carry out its responsibility by actually performing, managing and supervising the work.

*Id.* at BART012445.

## 2.     The alleged scheme

Spencer is the sole owner of two San Francisco Bay Area construction firms: F.W. Spencer and Son, Inc. ("FWS"), and Brisbane Mechanical Co. ("BMC").[2] Virgilio Talao ("Talao") was the owner and operator of San Luis Gonzaga Construction Co., ("SLG"), from 1983 until the company ceased to conduct business in 1999. Because he is of Philippine descent, Talao's business was certified as a

---

[2] The following facts are taken primarily from the declaration of Virgilio Talao. On November 13, 2006, four days before the hearing, defendants filed a motion "to exclude 'sham affidavit' of Virgilio Talao" pursuant to Federal Rules of Civil Procedure 56(e) and (g). As an initial matter, the motion is untimely. Rule 6(d) provides that written motions "shall be served not later than 5 days before the time specified for the hearing . . . ." Defendants' motion fails on the merits as well. Defendants rely on the rule that "[a] party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts." *Block v. City of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001) (citing *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975)). None of the alleged contradictions cited by defendants involve facts that are relevant to the Court in finding a genuine issue of material fact as to BART's one surviving cause of action. The alleged contradictions involve the Oakland City Hall Project, Talao's first meeting with Spencer, and SLG's re-certification by the San Francisco Municipal Railway in 1999. Even without these facts, BART has raised a genuine issue of material fact on one cause of action, as discussed below. Defendants cite no authority for the proposition that minor inconsistencies in irrelevant testimony justify disregarding an entire affidavit, at the summary judgment stage. The Court DENIES defendants' motion to exclude the affidavit of Virgilio Talao and request for sanctions. (Docket No. 184)

Minority Business Enterprise by the San Francisco Human Rights Commission.  In 1990, Talao began participating with Spencer and another general contractor, Michael D'Arcy, to create minority business fronts, in order to secure public works projects.  Around 1996, Spencer and Talao cut D'Arcy out of the picture, and hatched a scheme to form joint ventures, in which SLG would be the purported controlling partner, but would perform none of the work.  Under their arrangement, SLG would receive a different percentage of the contract price, anywhere from 1% to 3%, depending on the size of the contract.

In 1999, Spencer and Talao agreed to use the joint venture, SLG/BMC, to bid on subcontracts for planned construction at San Francisco International Airport ("SFO").  Those plans included expanding and modernizing the airport through the construction of a new international terminal and new parking garages.  They also included the construction of a BART line extension to SFO, covering both design and construction of the line as well as design and construction of the South San Francisco, San Bruno, and Millbrae BART stations.  All told, the prime contracts for the BART extension initially totaled over $700 million, and eventually reached $1.5 billion.

According to Talao, his arrangement with Spencer on the BART projects was as follows:

Mr. Spencer asked me to attend pre-bid meetings and make whatever statements were necessary to convince the prime contractors and BART that SLG was the controlling partner of the joint venture and therefore entitled to DBE credits.  Mr. Spencer told me, however, that he would be responsible again for supplying all of the labor, management, bonding, insurance, and everything necessary to operate the joint venture and complete the subcontract work.

Mr. McGahan[, legal counsel for Spencer's companies,] told me that he would again be responsible for executing all legal documentation required to support the position that the joint venture was controlled by SLG.

Mr. Spencer promised to continue to pay SLG according to the 3-2-1 percent arrangement, which we had previously agreed upon, for lending SLG's name and status as a DBE to the joint venture.  I did not try to renegotiate the payment percentages because SLG was receiving a good amount of money from Mr. Spencer at the time (approximately $50,000 a year) for merely lending its name and attending a few meetings.

I agreed to participate in the joint venture's efforts to obtain the contracts for work on the BART projects under Mr. Spencer's terms.  In accordance with our agreement, Mr. Spencer provided all funds, equipment, labor, insurance, bonding and management for the joint venture.  SLG provided no actual work on any of the BART projects.  I was paid, however, to attend meetings and to convince the prime contracts and BART that SLG, a valid DBE, was the controlling partner of the SLG/Brisbane joint venture.

*Id.* ¶ 53-56.

On February 6, 1998, BART awarded the 120 contract to Tutor-Saliba/Slattery JV ("Tutor"), and awarded the 140 contract to Sverdrup-Conco AJV ("Sverdrup"). Tutor was the low bidder in the amount of $526,256,925, beating the next lowest bidder by over $104 million. *See* Whitfield, Decl., Ex. 1. Sverdrup was the low bidder in the amount of $70,504,944, beating the next lowest bidder by over $12 million. *See id.*, Ex. 2. Tutor listed SLG/BMC as a DBE in its bid on the 120 contract. *See* Balmat Decl., Ex. 1 at BART012598. Sverdrup listed BMC as a DBE in its bid on the 140 contract. The Executive Decision Documents ("EDDs"), which granted award of these contracts, each contained the following identical language:

> **Disadvantaged Business Enterprise:** Because this is a design-build Contract in which the detailed scope of work for many subcontractors is not known at the time of bid, bidders were not required to submit with their bid the Disadvantaged Business Enterprise (DBE) participation data showing that they met the goals for the entire Contract or made good faith efforts to do so. Bidders were instead required to submit DBE participation information with their bid showing that they either met a goal of 40% for professional services, or made good faith efforts to do so. Bidders were also required to present a commitment to an overall goal of 25% for Facilities Construction; 5% for Trackwork and Systems Procurement; 15% for Trackwork and Systems Installation; and 50% for Trucking. The alternative approach described above was approved by the Federal Transit Administration (FTA).
>
> As the design is completed and subcontracts are issued during the Contract period, BART's Office of Civil Rights will verify that the Contractor has met its goal commitments, or that sufficient good faith efforts have been made. The Contract includes mechanisms for monitoring and enforcing the DBE participation requirements, including: Separate DBE cost-loaded schedule activities, with monthly updates; requirements for submittal of a DBE Trucking Plan; submittal of names of DBE firms and dollar values for DBE's contracted after Bid opening; requirement for good faith efforts to achieve DBE goals on change orders; maintenance of DBE participation records; liquidated damages for failure to meet DBE goals; and withholding or retention of funds for noncompliance with DBE participation requirements.

Whitfield Decl., Ex. 1 at BART032635. The subsequent paragraph in the EDD for the 120 contract stated:

> Tutor's bid contained [DBE] participation for professional services of 40%, which is the goal established by the District. Following bid submission, the District disallowed participation of certain DBE firms who had not been prequalified in accordance with Contract requirements, resulting in overall DBE participation for professional services of approximately 35%. The Office of Civil Rights has determined that Tutor made good faith efforts to meet the goal for professional services. Tutor also committed to meet the overall Contract goal of 23% and the categories of goals described above.

The corresponding paragraph in the EDD for the 140 contract stated:

> Sverdrup's bid contained [DBE] participation for professional services of 39.06%, which is less than the 40% goal established by the District. Sverdrup submitted good faith

6

**United States District Court**

For the Northern District of California

efforts documentation with its bid to support its attempts to meet the 40% goal. The [OCR] has determined that Sverdrup made good faith efforts to meet the goal for professional services. Sverdrup also committed to meet the overall Contract goal of 23% and the categories of goals described above.

Whitfield Decl., Ex. 2 at BART032645.

Subsequently, Tutor entered a subcontract agreement with SLG/BMC to perform portions of the mechanical work on contract 120, and Sverdrup entered into a subcontract with SLG/BMC to perform mechanical work on contract 140. *See* Balmat Decl., Exs. 44 & 56.

In late 1998, BART's Office of Civil Rights ("OCR") initiated an inquiry to confirm SLG/BMC's status as a DBE on contract 140. *See* Anchondo Decl. ¶ 27. As part of this inquiry, the OCR checked the status of the subcontractors against the Regional Transit Coordinating Council database of DBE firms ("RTCC database")[3]. *See* Whitfield Decl., Ex. 3. After finding that SLG/BMC was not listed in the RTCC database, the OCR requested copies of the joint venture agreement between SLG and BMC. *See id.* The OCR's review of the joint venture agreement raised concerns that SLG/BMC was not a legitimate joint venture, concerns which the OCR expressed in a February 1999 memo. Balmat Decl., Ex. 26. In the memo, the OCR concluded that "SLG is not the controlling partner in the joint venture." *See id.* In light of this finding, the author recommended "that OCR notify all parties of such findings and accord those interested parties, the opportunity to challenge and/or be heard on this matter." *Id.* The memo also concluded that, "[u]ntil such finding are disproved and/or set aside, DBE goal credit for the participation of [SLG/BMC] will not be counted towards meeting the contract DBE participation requirements." *Id.* BART continued, despite this finding, to pay for work performed by the joint venture. *See* Balmat Decl., Ex. 9.

On March 5, 1999, BART's construction oversight manager on the 140 contract forwarded the OCR memo to Svedrup, reiterating in a cover letter that "[u]ntil such findings are disproved and/or set aside, DBE goal credit for the [joint venture] will not be counted toward meeting the contract DBE participation requirements." Whitfield Decl., Ex. 9 at BART033325. On March 31, 1999, defendant Bruce Bonar, a project manager for FWS/BMC, wrote a letter to Svedrup regarding the OCR memo,

---

[3]The RTCC is an association of transit agencies in the Bay Area, including AC Transit, BART, CCCTA, Golden Gate Transit, SamTrans, San Francisco MUNI and Santa Clara County Transit.

stating that "we do **NOT** agree with many of the claims made within the above memo, we would request a face to face meeting to discuss and resolve." Balmat Decl., Ex. 41 (emphasis in original). On May 6, 1999, such a meeting was held. Anchondo Decl. ¶¶ 34, 35. Included in the meeting were Bonar, Talao, and Edmundo Anchondo, the OCR Officer in charge of the DBE program on the BART contracts, among others. *See id.* ¶ 34. At the meeting, Bonar and Talao provided several explanations for the discrepancies in the joint venture agreement. Despite these explanations, Anchondo requested additional documentation to establish that SLG was in fact the controlling partner of the joint venture. *See id.* ¶ 37.

Subsequently, on June 3, 1999, BART issued an EDD awarding contract 130 to Tutor. *See* Whitfield Decl, Ex. 7. Tutor was the low bidder in the amount of $45 million, lower than the next lowest bidder by over $7 million. *See id.* The EDD contained a summary of DBE compliance similar to that for the 120 and 140 contracts, but with an overall participation goal of only 22%. According to the EDD, Tutor "committed to meet the overall Contract goal of 22%." *Id.* at BART032642.

On August 20, 1999, BART awarded Contract 03QG-110 ("110") to Homer J. Olsen ("Olsen"). *See* Balmat Decl., Ex. 52. Olsen had listed SLG/BMC as a subcontractor, and checked the corresponding DBE box. *See id.*, Ex. 51 at BART038390. However, in light of the OCR's investigation into the joint venture agreement, in reviewing Olsen's bid, BART did not consider SLG/BMC a qualified DBE. *See id.*, Ex. 53 at BART038615; *see also* Whitfield Decl., Ex. 11 at BART 038612.

Only a few days after the award of the 110 contract, the state contractor's board suspended SLG's license for SLG's failure to pay a money judgment against it. *See* Balmat Decl., Ex. 57; Talao Decl. ¶ 77; Whitfield Decl., Ex. 12. On August 31, 1999, Spencer wrote a letter to the prime contractor on the 120 contract, Tutor, stating: "Effective August 20, 1999, [BMC] will complete the [120] project. I note one partner of the Joint Venture (SLG) is unable to continue. BMC will complete the project pursuant to agreement with SLG and our subcontract on the Project." Balmat Decl., Ex. 89 (emphasis in original). In September 1999, Talao wrote a letter to the Contractors' State License Board, requesting that SLG "be dis-associated from that of [BMC], insofar as any joint venture license or related projects are concerned." Balmat Decl., Ex. 58. Subsequently, McGahan, counsel for BMC, wrote the Board, requesting that the joint venture license be continued, in spite of SLG's request, in order to complete the

projects already in progress.  *See id.*, Ex. 59.  The Board granted BMC's request.  *See id.*, Ex. 60. BART was informed of these events, and "accepted the continuing validity of the subcontract awards to SLG/BMC and that BMC would complete the work required."  Opp. at 13:24-27.  "[A]s of September 1999, BART understood that . . . BMC would perform the subcontracts awarded to SLG/BMC."  *Id.* at 13:27-14:2.  The construction work at issue in this case was completed by 2003.

In October 2002, the City and County of San Francisco filed suit against defendants and others, alleging fraud and other misconduct in connection with the SFO projects.  *See San Francisco v. Spencer, et al.*, Case No. C 02-5084 PJH (N.D. Cal.).  During a deposition in that case, Talao disclosed many of the facts underlying this case.  *See* Balmat Decl., Ex. 96.  BART subsequently conducted an investigation, leading to the filing of this suit in November 2004.

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *'specific facts* showing that there is a genuine issue for trial.'"  *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir.), *cert. denied*, 479 U.S. 949 (1986).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party.  *T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).  The

United States District Court

For the Northern District of California

9

evidence the parties present must be admissible.  Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Hearsay statements found in affidavits are inadmissible.  *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980).  The party who will have the burden of proof must persuade the Court that it will have sufficient admissible evidence to justify going to trial.

## DISCUSSION

**1.     There is a genuine issue as to whether BART's claims are barred by the statute of limitations**

Defendants argue that the statute of limitations bars BART's causes of action for RICO, fraud, and the California False Claims Act ("CFCA").  The differences between the statute of limitations rules for the three claims are immaterial here, and the Court will therefore discuss them together.

In *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S. Ct. 2759 (1987), the Supreme Court established a 4-year limitations period for civil RICO claims.  The Ninth Circuit has "continuously followed the 'injury discovery' statute of limitations rule for civil RICO claims."  *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001).  Under this rule, "the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action."  *Id.* (citing *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).  Thus, the "injury discovery" rule creates a disjunctive two-prong test of actual or constructive notice; the statute begins running under either prong.[4]  Defendants bear the burden of establishing a statute of limitations defense. *See United States v Carter*, 906 F.2d 1375, 1378 (9th Cir. 1990).  Summary judgment on a statute of limitations defense is only appropriate "if the uncontroverted evidence irrefutably demonstrates that a

---

[4]The statute of limitations analysis for fraud and CFCA claims is similar.  Both claims have a three year statute of limitations, which "begins to run when the plaintiff has information which would put a reasonable person on inquiry."  *Kline v. Turner*, 87 Cal. App. 4th 1369, 1374 (2001); *see also Debros v. The Los Angeles Raiders*, 92 Cal. App. 4th 940 (2001).

United States District Court

For the Northern District of California

1   plaintiff discovered or should have discovered the fraud but failed to file a timely complaint." *Volk v.*

2   *D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987).

3       Defendants argue that BART had actual knowledge of the alleged in injury in 1999, more than

4   four years before BART filed this action.  For each of the four projects at issue in this case, BART had

5   established, by 1999, that the prime contractors were not entitled to DBE credit for the participation of

6   SLG/BMC.  Defendants argue that this knowledge constituted knowledge of the injury.  BART replies

7   by arguing that it had not firmly established SLG/BMC's status in 1999.  Even if it had, BART argues,

8   this knowledge was not enough to establish actual or constructive knowledge of the injury.

9       The record strongly indicates that BART knew SLG/BMC was not a *bona fide* DBE in 1999.

10  The injury at issue in these claims, however, arises from the alleged fraud.  Knowledge of SLG/BMC's

11  true status does not equate with knowledge that its status was fraudulently misrepresented. There is no

12  evidence that BART had *actual* knowledge or suspicion that defendants had fraudulently created

13  SLG/BMC.  The principal issue, therefore, is whether BART's knowledge that SLG/BMC was not a

14  *bona fide* DBE, along with other evidence, gave BART constructive notice of the fraud.

15      Defendants argue that there were several "storm warnings," throughout 1998 and 1999, which

16  would have alerted a reasonable person to the facts underlying BART's allegations of fraud.  *See*

17  *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3rd Cir. 2001).

18      *First "storm warning"*: Before BART awarded the contracts, it conducted a review of all of the

19  bids, including the DBE status of all listed subcontractors.  According to defendants, in doing so BART

20  should have noticed, through a cursory review of the RTCC database, that SLG/BMC was not a certified

21  DBE entity.  After realizing this, BART should have followed up by requiring SLG/BMC to complete

22  a certification application.  Federal Regulations and BART's DBE program required BART to do so,

23  according to defendants.  BART counters that while SLG/BMC was not in the RTCC database, SLG

24  was. *See* Balmat Decl., Ex. 72; Talao decl. ¶ 69.  SLG's registration as a DBE sufficed to establish

25  SLG/BMC's status, as long as "the [DBE] partner of the joint venture . . . is responsible for a clearly

26  defined portion of the work to be performed and shares in the ownership, control management

27  responsibilities, risks, and profits of the joint venture." 49 C.F.R. § 23.55 (1998).  Furthermore, BART

28  did follow up on SLG/BMC's absence from the RTCC database, by requesting a copy of the joint

11

venture agreement. This investigation led to the OCR memo, which is discussed below.

*Second "storm warning"*: As discussed, in late 1998 and early 1999, the OCR investigated SLG/BMC and determined that it was not a *bona fide* DBE entity. At this point, defendants argue, BART failed to require, as mandated by the Federal Regulations, that the contractors either (a) substitute SLG/BMC with a valid DBE contractor or (b) demonstrate good faith efforts to comply with the DBE commitment using other contractors. *See* 49 C.F.R. § 26.53(f)(2). BART's failure to do so, even if established, does not show that they should have known of *the fraud*; engaging in either of the two remedies required by the Code would not have led to discovery of the alleged fraud.

*Third "storm warning"*: In 1999, after BART had established that SLG/BMC was not a *bona fide* DBE entity, the prime contractors continued to list SLG/BMC as a DBE entity in monthly reports submitted to BART. According to defendants, BART never requested correction of the monthly reports. The Court fails to see how the contractors' listing of SLG/BMC, or forcing those contractors to correct the erroneous listings, would have led BART to discover the fraud.

The Court is thus unconvinced by any of the "storm warnings" pointed to by defendants. The Court is concerned, however, with the February 25, 1999 OCR memo. Balmat Decl., Ex. 26. The seventh concern cited in the OCR memo states:

> Page 19, signature(s) page. BMC's Vice President, William Spencer signed this agreement on 1/5/98 and SLG's Owner, Virgilio Talao signed this agreement on 1/07/99. If this agreement was entered into for the sole purpose of Contract 12YS-140, which was bid on January 9, 1998 and executed on May 15, 1998, the difference in dates raises concerns about the intent of the bidder at bid time and of the intent of the joint venture partners.
>
> Mr. Talao stated that the difference in dates was because he just signed it (on the date he brought it to OCR). Bid opening on this contract was on 1/9/98, which corresponds, more squarely with Spencer's signing the Agreement on 1/5/98, a couple of days before bid opening. This being the case, it does not appear that SLG and its owner knew of the existence of this Agreement for the purpose of the subsequent subcontract agreement with Sverdrup/Conco, prime contractor on Contract 12YS-140. If SLG did not know of the existence of the subcontract, then there is a significant deficiency in meeting the control requirement for SLG to be recognized as the 51% owner controlling partner of the joint venture.

*Id.* One of the allegations underlying BART's claims is that Spencer backdated his signature on the joint venture agreement in order to mislead BART into believing that SLG and BMC had a valid joint venture agreement prior to the award of the contract. *See* Second Amended Compl. ¶ 80. The OCR memo

United States District Court

For the Northern District of California

1   indicates that BART noticed the discrepancy in signature dates, and that such discrepancy raised

2   "additional concerns and questions."  Balmat Decl., Ex. 26.

3          The OCR memo does not indicate, however, that BART suspected backdating.  Instead, BART

4   suspected that the agreement might have been drafted by BMC, at the time of the bid, without SLG's

5   knowledge.  *See id.* ("the difference in dates raises concerns about the intent of the bidder at bid time

6   and of the intent of the joint venture partners.").  This might have constituted fraud, but of a different

7   nature than that alleged in BART's complaint.  Nonetheless, the OCR memo indicates that BART

8   suspected intentional foul play surrounding the creation and signature of the joint venture agreement.

9   Had they investigated the agreement, BART might have discovered that it was created after the time of

10  bid, and backdated by Spencer.  Nevertheless, the suspicion raised by the OCR memo does not

11  "irrefutably demonstrate[] that [BART] discovered or should have discovered the fraud but failed to file

12  a timely complaint."  *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987).  BART had

13  some concerns with the joint venture agreement; the Court cannot conclude at this stage, however, that

14  those concerns should have necessarily led them to uncover a significant portion of the alleged fraud.

15

16  **2.      BART fails to raise a triable issue as to the RICO injury requirement**

17         Defendants next argue that BART cannot prove that defendants caused it any injury cognizable

18  under RICO.  "To maintain a civil RICO claim predicated on mail fraud, a plaintiff must show that the

19  defendants' alleged misconduct proximately caused the injury."  *Poulos v. Caesars World, Inc.*, 379 F.3d

20  654, 664 (9th Cir. 2004) (citing cases).  The alleged injury must be to the plaintiff's "business or

21  property."  *Sedima v. Inrex Co.*, 473 U.S. 479, 496 (1985); *see also Grimmett v. Brown*, 75 F.3d 506,

22  510 (9th Cir. 1996).  Defendants argue that all of the contracts and subcontracts were fully performed,

23  according to the contracts, and that BART cannot show that it paid any more for the work than it would

24  have absent defendants' allegedly unlawful conduct.  Defendants also argue that BART cannot

25  demonstrate that it detrimentally relied on any representations regarding SLG/BMC's DBE status.

26         BART's principal theory of injury is that, because of defendants' misrepresentations, it paid for

27  a DBE entity to do the work at issue, but only received the work of a non-DBE.  *See* FAC ¶ 142.  This

28  theory requires BART to provide evidence of two facts:  (1) that BART relied on the alleged

13

misrepresentations in bargaining for a certain benefit (causation); and (2) that as a result of the

misrepresentations, BART did not receive the benefit of its bargain (injury).

### A.      Causation/reliance

BART states in its motion that "SLG/BMC's status as a DBE entity was material to the prime

contractors and to BART."  Mot. at 9:3-4.  There are three possible ways in which BART could prove

that SLG/BMC's status was material to BART:  it could prove that, had it known SLG/BMC was not

a qualified DBE entity, it would have (1) not awarded the prime contractor with the contract; (2) paid

the prime contractor less; or (3) paid SLG/BMC less.  BART presents no evidence to support the second

or third theories; indeed, such evidence as there is appears to preclude any argument by BART on the

third theory.  In his deposition, James Van Epps testified  as follows:

> Q:      Why did BART continue to pay for the ventilation work that was done by [BMC]
> after [SLG] disassociated from it, from the joint venture?
>
> A:      The work was being done by the contractor.  We looked at – and to tell you how
> this, how payments were made, while we knew that, who a subcontractor might
> be on the project, the process was that payments were made in estimates of work
> completed per period by function or by line item of work being executed.  So we
> didn't pay based on San Luis Gonzaga/Brisbane or anybody else being on the
> project.  We looked at the general contractor, the prime contractor's work and
> looked at the work done per line, pretty much, and saw, for instance, that the
> ventilation work was being completed by the general contractor, and we paid him
> for that line.

Whitfield Decl., Ex. 40 at 169-70.  According to Van Epps, therefore, in paying for completed work, the

DBE status of the subcontractors was of absolutely no import to BART.

While it never explicitly says so,  BART's primary reliance contention appears to surround the

first theory, i.e. that SLG/BMC's status was material to BART in awarding the contracts to the prime

contractors.  However, BART only cites to evidence tending to show that SLG/BMC's status was

material *to the prime contractors*.  See Opp. at 18-20, citing Balmat Decl., Exs. 42 (Fink Depo.), 66

(Sexton Depo.).  Dan Fink, a representative of prime contractor Sverdrup, testified only that Sverdrup

"relied on [SLG/BMC's DBE status] to some extent in submitting its bid."  *See* Balmat Decl., Ex. 42

(Fink Depo.) at 11:18-23.  He says nothing of BART's reliance on SLG/BMC's status.  Roger Sexton,

a representative of prime contractor Tutor, testified only that trying to meet a DBE "goal" was important

United States District Court

For the Northern District of California

14

1   to both Tutor and the owner of the project, in this case BART; however, in his testimony Sexton says

2   nothing of whether BART relied in any way on SLG/BMC's status as a DBE entity. *See id.*, Ex. 66

3   (Sexton Depo.) at 34:12-35:17.  This evidence might support a claim by the prime contractors against

4   defendants, but it is insufficient to establish that BART detrimentally relied on SLG/BMC's

5   misrepresentations.

6          Moreover, the evidence suggests that BART did not, in fact, rely to any material degree on

7   SLG/BMC's alleged misrepresentation in awarding the contracts.  For example, the declaration of

8   Edmundo Anchondo, the OCR Officer in charge of the DBE program on the BART contracts, makes

9   clear that the *validity* of a subcontractor's DBE status was immaterial in making the bid award decisions.

10  He states:

11         My inquiry, prior to the [140] contract being awarded, consisted of determining whether
       the identified DBE was: (1) certified by an agency recognized by BART; or, (2) required
12     DBE certification by BART.  If the identified DBE was not already certified, BART
       would complete its own certification process of the company.  *The certification did not*
13     *need to be completed before the contract was awarded.*  The certification did need to be
       completed before the Bidder could begin receiving DBE credit for the identified
14     contractor.

15  Anchondo Decl. ¶ 20 (emphasis added).  The validity of a DBE claim thus did not become material until

16  a Bidder wanted to receive DBE credit for the DBE subcontractor.  This fact strongly suggests that

17  BART did not rely heavily on pre-Award representations made by subcontractors.  Were it truly

18  concerned with the validity of subcontractors' DBE claims, at the bid stage, BART would have required

19  certification before awarding the bid.

20         Similarly, section SC7.1.3.4 of the Contract Books, which describe in great detail the DBE

21  requirements and bidding process, states as follows:

22         **Awards.**  Any award of this Contract by the District shall be to the lowest responsible
       Bidder whose proposal complies with all the [DBE] requirements prescribed and who
23     has met the Professional Services goal and has committed to meeting the goals for
       Material Procurements, Facilities Construction, Trackwork and Systems, Trackwork and
24     System Installation, and Trucking, or has demonstrated, to the satisfaction of the District,
       good faith efforts to do so.  Meeting the goal and commitments, or demonstrating to the
25     satisfaction of the District, good faith efforts to do so is a condition for being eligible for
       Award.
26
27  Balmat Decl., Ex. 1 at Bates # BART012455.  The work SLG/BMC bid on did not fall under the

28  "Professional Services" category.  SLG/BMC was therefore not listed to show that the prime contractors

15

1  would actually meet the DBE goals, but only that the prime contractors were, at most, "committed" to

2  meeting the percentage goals.

3      Most convincingly, the EDDs confirm that bidders were only "required to present *a commitment

4  to an overall goal*," and that, pre-bid, the OCR *only tallied up the percentage of DBEs for the

5  professional services category. See, e.g.,* Whitfield Decl., Ex. 1 at BART032635.

6      The only tenable argument BART could make is that in evaluating whether bidders were

7  "committed" to meeting the DBE goals, it considered the subcontractor listings. BART could thus argue

8  that it relied on SLG/BMC's misrepresentations in concluding that the prime contractors were

9  "committed." BART has not explicitly made this argument, however, and cites to no evidence which

10  would support it. The only evidence of this nature in the record is the Anchondo declaration, which

11  states in pertinent part:

> The contracts listed above were awarded, in part, because the bidders demonstrated that they could achieve the category of work requirements identified in the contracts. Specifically, BART took into account each DBE contractor listed in the bids including the DBEs identified as SLG/BMC and BMC.
>
> In particular Tutor listed SLG/BMC as DBE eligible on Contract Nos. 12YC-120 and 12YS-130 and Sverdrup listed BMC as DBE eligible on Contract No. 12YS-140. It was important to BART that SLG/BMC and that BMC were listed as DBE eligible contractors in the highly-skilled area of Facilities Construction for ventilation, mechanical fabricating and plumbing work.

18  Anchondo Decl. ¶¶ 24-25. While this passage does provide evidence of reliance, the Court is troubled

19  by several circumstances. First, BART does not cite to this evidence in its opposition. Since it appears

20  to be the best, and only, evidence BART has of direct reliance, it is curious that BART does not cite to

21  it. Second, it is unclear what Anchondo's role in selecting the prime contractors was. Consequently,

22  it is unclear whether Anchondo's statements are based on personal knowledge. Third, BART presents

23  no evidence corroborating Anchondo's statements. There were presumably many individuals involved

24  in the bid award process; had the DBE status of SLG/BMC been material to the BART's decision,

25  presumably others would be able to testify so. Fourth, BART provides no evidence as to what evidence

26  it considered in determining whether a bid demonstrated "commitment" to meeting the DBE goals.

27  Fifth, both Anchondo and BART stop short of claiming that but-for SLG/BMC's listing as a DBE,

28  BART would not have awarded the contracts as it did. BART must prove more than the fact that

SLG/BMC's listing was "important"; it must prove that had the listing been accurate, BART would have taken different action.

Finally, Anchondo makes no mention of the 110 contract. Moreover, the undisputed evidence shows that BART did not consider SLG/BMC to be a valid DBE at the time it awarded the 110 contract. *See* Balmat Decl., Ex. 53 at BART038615. Similarly, the evidence shows that BART did not consider SLG/BMC to be a valid DBE at the time it awarded the 130 contract. The OCR memo issued well before BART awarded the 130 contract. BART therefore could not have awarded the 130 contract in reliance on a mistaken belief that SLG/BMC was a valid DBE.

There is thus little, if any, evidence that BART relied on SLG/BMC's representations in awarding the contracts at issue. As discussed below, none of the cases cited by BART, dealing with reliance in the context of fraud or RICO, are analogous. Furthermore, the Court is concerned with the admissibility and credibility of the little evidence that BART does provide. Nonetheless, at this stage the Court does not make credibility determinations or weigh the evidence, and must draw all inferences in the light most favorable to BART. *See T.W. Electric*, 809 F.2d at 630-31. The Anchondo declaration raises a triable issue of fact as to BART's reliance in relation to the 120 and 140 contracts. With respect to the 110 and 130 contracts, BART has failed to establish an issue of fact as to reliance on the alleged misrepresentations, and summary judgment must therefore be granted.

**B.      Injury**

Even if BART can establish reliance, it has presented no evidence to establish that such reliance led to a cognizable injury. As defendants argue, BART was only concerned with the prime contractors reaching a certain percentage level of DBE-subcontractor participation. *See e.g.* Balmat Decl., Ex. 1 at BART012321 ("The [DBE] participation goal for the Contract is 23% of the Total Contract Bid Price, excluding Allowances, and is distributed by Category of Work goals as follows: [breakdown across five categories of work]"). It appears undisputed that in three of the four projects DBE-subcontractor participation met the levels promised by the prime contractors.[5] In the fourth project, the prime

_____

[5]Defendants argue that this is so, and BART does not argue otherwise. However, there is no evidence in the record on this point.

1   contractor met the overall DBE goal, but fell short of the DBE goal in one category that SLG/BMC was

2   not a part of.  *See* Errata to Whitfield Decl., Exhibit 40 (VanEpps Depo.). BART, defendants therefore

3   argue, received the full benefit of its bargain; it paid for a certain percentage of  DBE-subcontractor

4   participation, spread in particular ways among different types of work, and received that percentage of

5   DBE-subcontractor participation, spread across the different types of work as promised.

6        BART replies that defendants' argument "misapprehend[s] BART's RICO claim." Opp. at 28:5

7   In the confusing discussion that follows, however, BART does nothing to correct defendants'

8   "misapprehension."   BART argues that its "RICO claim is not simply that contract performance was

9   deficient, but that 'the value of [its] agreements was misrepresented *ab initio.*'" *Id.* at 30:2-4 (quoting

10   *Bennett v. Berg*, 685 F.2d 1053, 1058 (8th Cir. 1981)).  This does not counter defendants' contention

11   that the "value" of the contracts was a certain level of DBE participation.  The implication of BART's

12   argument is that the benefit of its bargain was receiving construction work completed by the particular

13   DBE entities named in the bid, such as SLG/BMC.  BART never explicitly states this, however, and

14   provides no evidence that it valued having particular pieces of the project completed by particular DBE

15   subcontractors.

16        Furthermore, the evidence belies any argument that BART was concerned with having particular

17   work done by particular DBE subcontractors.  For example, once SLG dropped from the joint venture,

18   BART approved the completion of the remaining work by BMC, which never purported to have DBE

19   status.  Had fulfillment of BART's bargain required that the work be completed by a DBE entity, BART

20   logically should not have allowed a non-DBE entity to complete the work.  BART should have required

21   the prime contractor to replace SLG/BMC with a DBE entity, and it did no such thing.

22        Similarly, the Contract Books suggest that BART was concerned only with meeting overall

23   participation rates.  For example, the section on DBE noncompliance states, in pertinent part:

24        failure to *maintain the level* of DBE participation offered in the Bid in accordance with
    DBE provisions, shall be grounds at the discretion of the District, for termination of the

25   Contract in whole or in part, for withholding payments due Contractor during the period
    of noncompliance, or increasing the amount of retention in accordance with Article

26   SC9.6.  In addition, failure to meet any of the *goals* shall be grounds for assessment of
    liquidated damages in accordance with Article SC8.3.1.

27

28   Balmat Decl., Ex. 1 at BART012458 (emphasis added).  This language communicates a concern with

18

"goals" and "levels," not with particular work being completed by particular DBE subcontractors. There is thus no triable issue as to the fact that BART suffered no cognizable injury. BART has provided no evidence that it failed to receive the benefit of its bargain: certain levels of DBE participation, spread over five categories.

The Court is also unconvinced by BART's argument that this case is analogous to many district court cases in which "a RICO violation causes a material difference between what the victim thought it was getting under a contract and what it actually received or where it paid materially more for what it received than it would have if the fraud had not infected the transaction." Opp. at 29:19-21 (citing cases). In all of the cases BART cites, reliance and injury were clear. For example, in *City of Chicago Heights v. Lobue*, 914 F. Supp. 279, 281 (N.D. Ill. 1996), over the course of many years, a chemical supplier knowingly billed the plaintiff for 35,000 pounds of a treatment chemical, but only delivered 24,000 pounds. The supplier passed much of the overpayments on as kickbacks to the contractor who arranged the deals. *See id.* The district court found that the overpayments constituted a valid RICO injury, for which plaintiff could recover. *See id.* at 282-83. Unlike in the instant case, in *City of Chicago Heights* the plaintiff clearly failed to receive the benefit of its bargain. It contracted and paid for 35,000 pounds of chemicals, but only received 26,000. It relied on the expectation that it would receive 35,000 pounds; had the plaintiff known it would only receive 26,000, it would not have paid for 35,000. Here, as discussed, BART provides no evidence that it received anything less than desired, and BART's reliance, if any, is far less clear than the plaintiff's in *City of Chicago Heights*.

Similarly, in *Rehabilitation Institute v. Hicks*, 1991 U.S. Dist. LEXIS 8173 at *1, *6 (N.D. Ill. July 14, 1991), the defendant submitted invoices to the plaintiff containing

> "constant" misrepresentations as to the quantities and types of products delivered. [The defendant] profited by delivering cleaning products and equipment to [the plaintiff] on which he was not the successful bidder, and for which he did not have a purchase order, and submitting invoices which falsely listed products which he had not actually delivered. He then obtained payment from [the plaintiff] for products and equipment he had not actually delivered.

The district court granted summary judgment for the plaintiff on his RICO and fraud claims. *See id.* at *21. In *Hicks*, the plaintiff had bargained and paid for certain goods, which it did not receive. Reliance and damages were clear. *See also Alcorn County v. Interstate Supplies*, 731 F.2d 1160, 1162 (5th Cir.

1   1984) (allowing RICO claim to proceed where "the defendant . . . collected more than $46,000 from

2   Alcorn County for office supplies it sold to the county at inflated prices, including seventy-one cartons

3   of toner for use in copying machines and seventy-three thousand ball-point and felt-tipped pens, the

4   majority of which were never delivered.").

5         In *Mason Tenders District Counsel Pension Fund v. Messera*, 1996 U.S. Dist. LEXIS 8929 at

6   *1, *9 (S.D.N.Y. June 26, 1996), also cited by BART, the court found that allegations of kickbacks were

7   sufficient to plead a RICO injury.  In that case, however, the predicate RICO acts were violations of 18

8   U.S.C. § 1954, which prohibits kickbacks to and from employee pension funds.  *See id.* at *12-13.

9   Fraud, and reliance thereon, were not at issue.

10        In *Low v. Altus Finance, S.A.*, 136 F. Supp. 2d 1113, 1116 (C.D. Cal. 2001), the plaintiff, the

11  California Insurance Commissioner, brought a common law fraud claim based on allegations that the

12  defendants "lied about their various relationships with each other, in order to induce the Commissioner

13  to sell ELIC's junk bond portfolio and transfer its insurance business."  The court found reliance and

14  injury properly pled, stating:

> Had [the Commissioner] known that [the defendants] were going to control the insurance
> company, he *could not* lawfully have entered into either the Rehabilitation Plan or the
> Modified Plan and *could not* lawfully have sold the bond portfolio to [the defendants].
> . . . [B]ecause he *could not* have "done the deal," the Commissioner in fact *would not*
> have sold the bonds or entered into the contracts-- regardless of the absence of any better
> alternatives or offers from other bidders.

18  *See id.* at 1117 (emphasis in original).  Thus, unlike in the instant case, there was little doubt in *Low* that,

19  but-for the defendants' misrepresentations, the plaintiff would not have taken the actions at issue.

20  BART does not provide such clear-cut evidence that it "could not" or "would not" have "done the deal"

21  had it known SLC/BMG was not a *bona fide* DBE.

22

23        During oral argument, counsel for BART pointed to *Curiale v. Capolino*, 883 F. Supp. 941

24  (S.D.N.Y. 1995), as supporting their damages theory.  In *Curiale*, the Superintendent of Insurance of the

25  State of New York brought a successful RICO claim against a contractor for bribing employees of the

26  state government (who were also defendants) in order to secure government contracts.  In that case, the

27  state employees involved in the scheme "approved or recommended [award of contracts] without

28  securing *bona fide* competitive bids which, in almost all cases, directly violated competitive bidding

United States District Court

For the Northern District of California

1    regulations of the" state.  *Id.* at 944-45.  As a result, "[i]n many cases, the prices paid were substantially

2    in excess of fair market value."  *Id.* at 944.  Causation and damages were clear:  but-for the scheme, the

3    contracts would have been sent out for competitive bid, and the state would have paid less.  Here, there

4    is no such evidence of causation and damages.[6]

5         For the foregoing reasons, the Court finds that BART has failed to provide any evidence that

6    defendants' alleged misrepresentation of its DBE status caused BART any cognizable injury.

7         BART also argues a second theory of injury, which does not require that it prove reliance on

8    SLG/BMC's DBE status.  BART argues that "[o]ne of the consequences of defendants' fraudulent

9    scheme is that [F.W. Spencer and Son] performed and realized the benefit of subcontracts in which

10   SLG/BMC was the listed subcontractor.  That meant that the prime contractors were in violation of the

11   listing law," and BART was therefore forced to bring legal proceedings against the prime contractors.

12   Opp. at 32:5-8.  Those legal proceedings settled.  *See* Salazar Decl. ¶ 6.  BART argues that the costs it

13   incurred in those proceedings constitute a cognizable RICO injury.  *See id.* at 32:12-15.

14        The critical flaw of this alternate damages theory is that BART presents no evidence that

15   defendants were, in fact, in violation of the listing laws.  BART only provides evidence of the costs it

16   incurred in investigating and prosecuting the alleged violations.  *See, e.g.,* Salazar Decl. ¶¶ 4, 5; Balmat

17   Decl., Exs. 10, 11.  While legal expenses incurred in collateral proceedings may constitute RICO

18   damages in some extraordinary cases, *see Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1035 (N.D. Cal.

19   2004), they cannot constitute damages where there is no evidence that the collateral proceedings were

20   necessary.

21        For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment on

22   BART's first cause of action, for violation of RICO, 18 U.S.C. § 1962(c).

23        The Court also GRANTS defendants' motion for summary judgment on BART's § 1962(d)

24

25   ──────────────

        [6]In the memorandum opinion accompanying the published *Curiale* opinion, the district court
     allowed plaintiff "to recover from [the contractor] the gross amounts paid to [the contractor's] entities

26   by the Bureau in transactions tainted by corruption."  *Id.* at 943.  The court did so "[u]nder a well-
     established New York rule" of "strict forfeiture," allowing a public entity "to recover from a vendor the

27   full amount paid on an illegal municipal contract without regard to the value of the goods or services
     provided. . . ."  *Id.* (citing *S.T. Grand, Inc. v. City of New York*, 298 N.E.2d 105 (1973)).  Defendants
     do not show that any similar "strict forfeiture" principle exists under California law or the RICO statute.

28

1  RICO conspiracy claim. *See Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1127 (9th Cir. 1997)

2  ("[I]f the section 1962(c) claim does not state an action upon which relief could ever be granted,

3  regardless of the evidence, then the section 1962(d) claim cannot be entertained.").

4

5  **3.      Fraud**

6       According to California law, the elements of common law fraud are "misrepresentation,

7  knowledge of its falsity, intent to defraud, justifiable reliance and resulting damage." *Gil v. Bank of Am.,*

8  *Nat'l Ass'n*, 42 Cal. Rptr. 3d 310, 317 (Cal. Ct. App. 2006).   For the reasons discussed above in the

9  context of BART's RICO claim, the Court finds that BART has failed to provide any evidence of

10  cognizable damages.   The Court therefore GRANTS defendants' motion for summary judgment on

11  BART's third cause of action, for fraud.

12

13  **4.      False Claims Act Violations**

14       Defendants also move for summary judgment on BART's claim under the California False

15  Claims Act ("CFCA") (Cal. Gov. Code § 12650 et seq.).

16       The California False Claims Act permits the recovery of civil penalties and treble
17       damages from any person who "knowingly presents or causes to be presented [to the state
         or any political subdivision] . . . a false claim for payment or approval."  The word
18       "person" "includes any . . . corporation [or] business . . . ."  A "claim" "includes any
         request or demand for money . . . made to any employee, officer, or agent of the state or
19       of any political subdivision . . . ."  A plaintiff must allege that the person had actual
         knowledge of the falsity of the information, acted in deliberate ignorance of its truth or
20       falsity, and/or acted in reckless disregard of its truth or falsity.

21  *City of Pomona v. Superior Court*, 89 Cal. App. 4th 793, 801 (Cal. Ct. App. 2001) (quoting Cal. Gov.

22  Code § 12650 et seq.).   The CFCA "should be given the broadest possible construction consistent with"

23  its purpose "to prevent fraud on the public treasury."  *Id.* (citing cases).  The CFCA is "patterned on a

24  similar federal statutory scheme (31 U.S.C. § 3729 et seq.)."  *Id.* (quoting case).   Where there is a lack

25  of California authority interpreting the CFCA, "it is appropriate to turn to federal cases for guidance in

26  interpreting the act."  *Id.* at 802.

27       Under the federal act, the essential elements are:  "(1) a false statement or fraudulent course of

28  conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or

United States District Court

For the Northern District of California

forfeit moneys due." *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006). The third requirement, "[m]ateriality, a mixed question of law and fact, depends on 'whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action.'" *City of Pomona*, 89 Cal. App. 4th at 802 (quoting *U.S. ex. rel. Berge v. Trustees of Univ. of Ala.*, 104 F.3d 1453, 1459 (4th Cir. 1997)). Thus unlike a RICO or fraud claim, a false claims action does not require a showing of actual reliance, but only that the falsity "has a natural tendency" to influence action.

Furthermore, under the federal act, "the claim itself need not be false but only need be underpinned by fraud." *Id.* In other words, even if the government ultimately receives the benefit of a fair bargain, this fact does not shield defendants from liability for fraudulent or false statements made in connection with negotiating or securing that bargain. As the Fourth Circuit stated in *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999), in cases where "the work contract was actually performed to specifications at the price agreed," false claims act liability may still attach "because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder." "[A]ny time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act liability may attach." *Id.* The fraud need only be a material part of a transaction or group of transactions that eventually lead to a claim for government payment. Unlike in the RICO and fraud contexts, plaintiffs need not show that the misrepresentation proximately caused an overpayment, or even that there was, in fact, an overpayment. If a fraud is shown in connection with a payment by the government, an overpayment is essentially presumed.

In this case, defendants first argue that summary judgment is warranted because the prime contractors, rather than defendants, submitted the pay applications to BART. Those pay applications "represented the prime contractors' best estimate of the cost to complete that work." Mot. at 34:8-10. A legitimate estimate by a contractor of work performed is not a "false claim." *See United States ex rel. Bettis v. Odebrecht Contractors of California, Inc.*, 297 F. Supp. 2d 272 (D.D.C. 2004). The prime contractors' requests for payment did not, defendants therefore argue, constitute "false claims." As discussed above, however, the ultimate claim need not be fraudulent; fraudulent conduct only need underlie the claim. *See City of Pomona*, 89 Cal. App. 4th at 802. Here, there is evidence that defendants misrepresented their DBE status in order to win subcontracts. That conduct was designed to profit from

claims made by the prime contractors on BART.

Defendants next argue that BART cannot meet the materiality requirement. As discussed above in the context of the RICO claim, BART has raised a genuine issue as to whether it relied on SLG/BMC's status as a DBE in awarding the 120 and 140 contracts. A showing of materiality requires even less than a showing of actual reliance. The Court therefore finds a genuine issue as to whether the alleged falsity was material, with respect to contracts 120 and 140. As discussed, however, BART did not consider SLG/BMC to be a valid DBE at the time it awarded the 110 and 130 contracts. SLG/BMC's status as a DBE therefore could not have been material to the decision to award the 110 and 130 contracts.

For the foregoing reasons, the Court DENIES defendants' motion for summary adjudication of BART's second cause of action, for violation of the CFCA, with respect to the 120 and 140 contracts. The Court GRANTS defendants' motion for summary adjudication of BART's second cause of action with respect to the 110 and 130 contracts.

**5.    Unjust enrichment**

"To state a claim for unjust enrichment, a plaintiff must allege:  (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another." *Sigma Dynamics, Inc. v. E. Piphany, Inc.*, No. C-04-569, 2004 U.S. Dist. LEXIS 24261, at *1, *15 (N.D. Cal. May 21, 2004). "A person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum paid was necessary for the discharge of a duty, for the performance of a condition, or for the acceptance of an offer, is entitled to restitution of the excess." Restatement (First) of Restitution § 20 (1937). "A person who has paid money to another because of a mistake of fact and who does not obtain what he expected in return is entitled to restitution from the other if the mistake was induced . . . by the fraud of the payee." *Id.* § 28. "If, in spite of the fraud or misrepresentation, the transferor has obtained exactly what he expected to receive in exchange for what he gave, he is not ordinarily entitled to rescind the transaction and to recover back what he gave." *Id.* § 28 cmt. d. "A person who has conferred a benefit upon another because of a mistake, whether or not the mistake was induced by fraud or misrepresentation, is entitled to restitution only if the mistake caused the conferring of the benefit." *Id.*

24

§ 9.

BART's theory of unjust enrichment is far from clear. The SAC suggests that BART is entitled to remedies for unjust enrichment because BART paid "for work done unlawfully, in violation of California law, including the Contractors' State License Law . . . ." SAC ¶ 148. "The Subcontracts and prime contracts at issue herein required that SLG/Brisbane perform the Subcontracts while operating under a valid license," which they failed to do. SAC ¶ 147. On its face, this appears to be a breach of contract claim, rather than an unjust enrichment claim. BART's opposition does little to clarify the basis of its claim: it states only that, "[a]s demonstrated above, BART *has* suffered cognizable loss, of about $260,000, but defendants' ill-gotten gains and the circumstances under which they realized them make this a proper case for unjust enrichment, with disgorgement as the remedy." Opp. at 38:4-6 (emphasis in original). The Court assumes that the $260,000 figure is an estimate of the amount of money paid as kickbacks to SLG in exchange for its service as a DBE front.

Based on the totality of the pleadings, arguments, and evidence, the Court presumes that BART intends its unjust enrichment claim to fall within either the theory described in section 20, or in section 28 of the Restatement: that BART paid more than "was necessary" to secure performance, or that BART did not obtain what it expected. The second theory fails for the same reason the RICO claim failed: BART provides no evidence that it obtained any less than expected.

With regard to the first theory, BART's argument would be that the alleged kickbacks evidence that BART paid more than was necessary to secure performance. The kickbacks did not advance, in any way, completion of the contracts or subcontracts. BART, so the theory presumably goes, could have secured the contracts and the performance for less than it did, and under section 20 of the Restatement, is entitled to restitution. Though this theory initially appears to fit squarely within the language of Restatement section 20, further inquiry shows that section 20 is not designed to address the type of overpayment at issue here. First, the illustrations to section 20 are clearly distinguishable from the conduct alleged here. For example, illustration 1 states: "A agrees to pay B fourteen cents per pound for cotton. Erroneously believing that B has delivered to him 10,000 pounds of cotton, A pays B $1400, although only 8000 pounds were actually delivered. A is entitled to restitution of $280." Illustration 3 states: "A offers to sell his car to B for $900. B sends A $1000, momentarily believing that to be the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  price asked.  B is entitled to restitution of $100."  None of the illustrations involve a case such as this,

2  where all parties paid for, and received, exactly what they bargained for.

3       Moreover, a literal application of the text of section 20 would undermine the finality of most

4  contracts.  Any time a party to a contract ends up earning more than a minimal amount of profit, they

5  probably would have agreed to do the contract for less.  Thus, if anyone were truly allowed to recover

6  the excess where they agreed to a bargain based upon "a mistake of fact that the sum paid was necessary

7  for the discharge of a duty," then anytime one party to a contract ended up earning more than a minimal

8  amount of profit, the other side could seek to recover the excess.  The courts would overflow, and the

9  entire culture and law of contract negotiations would have to be rethought.  Section 20 therefore cannot

10  apply here.

11      For the foregoing reasons, the Court GRANTS defendants' motion for summary adjudication

12  of BART's fourth cause of action, for unjust enrichment.

13

14  **6.       Breach of Contract**

15      The elements of breach of contract claim are (1) the existence of a valid contract between the

16  parties; (2) plaintiff's performance; (3) defendant's unjustified or unexcused failure to perform; and (4)

17  damages to plaintiff caused by the breach.  *See Careau & Co. v. Sec. Pac. Business Credit, Inc.*, 222 Cal.

18  App.3d 1371, 1388 (1990).  Defendants argue that BART can provide no evidence of breach, nor of

19  damages.  In response, BART merely states: "The evidence is to the contrary on both points."  Opp. at

20  46:20-21 (citing Balmat Decl., Exs. 61-64).  The evidence BART cites in support of its one sentence

21  argument is a series of letters between counsel for BART and counsel for defendants, in which BART

22  demands a second inspection of certain documents, and defendants refuse.  *See* Balmat Decl., Exs. 61-

23  64.  The letters raise a triable issue of fact as to whether defendants breached their contractual

24  obligations to allow inspection of documents related to the contracts.  However, the letters contain no

25  evidence of any resulting damage suffered by BART.  The Court therefore grants defendants' motion

26  for summary judgment on BART's fifth claim, for breach of contract.

27

28

**United States District Court**

For the Northern District of California

**7.      Estoppel/Waiver**

Defendants seek summary adjudication of its defenses of estoppel and waiver.  A waiver is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  The traditional elements of equitable estoppel are: "(1) the party to be estopped knows the facts; (2) the party intends that his or her conduct will be acted on; (3) the claimant must be ignorant of the true facts; (4) and the claimant must detrimentally rely on the other party's conduct." *Salgado-Diaz v. Ashcroft*, 395 F.3d 1158, 1166 (9th Cir. 2005).

Defendants argue that BART knew of the facts giving rise to this lawsuit in 1999, and at that point "should have canceled the SLG/BMC subcontracts before substantial work was performed." Mot. at 5-6.  As discussed above in the statute of limitations context, there is a triable issue as to when BART knew of the facts giving rise to this action.  The Court therefore denies defendants' motion for summary judgment on its waiver and estoppel defenses.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part and DENIES in part defendants' motion for summary judgment.  (Docket Nos. 107 & 108)  Only BART's second claim, for violation of the California False Claims Act, survives, and it does so only with respect to the 120 and 140 contracts.  As discussed *supra*, the Court DENIES plaintiff's request to file supplemental briefing (Docket No. 211), and DENIES defendants' motion to exclude the affidavit of Virgilio Talao and for sanctions (Docket No. 184).  The Court also DENIES as moot plaintiff's objections to evidence (Docket No. 205), and DENIES as moot defendants' objections to evidence (Docket Nos. 176, 178, 180, 181, and 183); all of the evidence objected to was either irrelevant to the Court's consideration, or was relevant only to issues decided in favor of the objecting party.

**IT IS SO ORDERED.**

Dated: December 5, 2006

_____
SUSAN ILLSTON
United States District Judge